Case 14-1151 Sylvia James v. Hilliard Hampton et al. Oral argument, 15 minutes for the plaintiff, 15 minutes to be shared by the defendants. Mr. Hirsch for the appellant. May it please the court, Jason Hirsch for appellant Sylvia James. Good morning, your honors. I'd like to reserve five minutes for rebuttal. This case, your honors, is not about one judge in the state of Michigan who happened to be disciplined. It's really about the application of constitutional principles. It's about the power of the state and it's about the fair and equal application of the laws. First, this case is about the power of the state to conduct warrantless searches. What we have here is an elected state judge who had served the people of the state of Michigan for over 23 years and who became embroiled in essentially a political dispute between the mayor of the city of Inkster, Michigan and the city council of Inkster, Michigan. In the state of Michigan, the local courts are funded by local funding units. In this case, it happened to be the city of Inkster. As a form of political payback for Judge James' involvement in local politics, the mayor and his affiliates prompted an investigation of Judge James by the Michigan Judicial Tenure Commission, the JTC. The JTC is an arm of the Michigan government charged with monitoring and disciplining judges in the state. The JTC has essentially unbridled power to investigate complaints brought against judges and to determine whether or not to bring formal charges. Now, in the matter at bar, Judge James was immediately placed on administrative leave by the Michigan Supreme Court while the JTC was conducting its investigation, but before any formal charges had been brought. Judge James was given less than three hours to fully clean out and vacate the office that she had occupied for 23 years. Nonetheless, Judge James' office at the court was searched either by or at the direction of agents of the JTC. Not only was the general office area searched, there was also a private locked safe in the office, which was also searched. The lock was broken into in order to gain access to the safe. The material that was removed from Judge James' office and that safe included documents which could ultimately have assisted her in her defense against formal charges that were, in fact, subsequently brought by the JTC. These documents were never provided by James, and she has alleged that some of those documents were destroyed, and that was, in fact, affirmed by subsequent testimony, although I agree that's not particularly relevant for 12b-6 since we're analyzing the complaint here. There is some common ground, actually, between the parties here. The parties essentially agree that warrantless searches are per se unreasonable as a general rule under the Fourth Amendment. There is also clearly a right to privacy in one's own office, and searches and seizures by government employers of private property of employees is generally subject to the Fourth Amendment. The parties also fundamentally agree that the applicable analysis here is that of O'Connor v. Ortega, United States Supreme Court, 480 U.S. 709. In O'Connor, the court established a two-part test for reasonableness of a search. Part one was whether the employer's actions was justified at its inception. Part two is whether the search conducted was reasonably related in scope to the circumstances which justified the interference in the first place. Now here, the plaintiff has alleged that the JTC's actions, the search, were unreasonable at inception for a couple reasons. One, the search lacked any sort of safeguards to ensure that the items that were being removed were maintained in some manner, or cataloged, or indexed, or even identified. And in fact, again, the allegation is that items were destroyed. So there's no evidence now of what those items were. There's no way to know. Now, even sort of under a general reasonableness under all circumstances kind of analysis, which I think is sort of what defendants here are advocating, the destruction of material obtained from a search could hardly be considered reasonable. And in fact, this material, or some of this material, was in a locked safe. Judge James was already out. There was no exigent circumstances. There was no risk that she could perhaps go in and remove or alter or destroy something. At very least, she could have been present or there could have been catalogs or documents. There was simply no rush for this, no explanation. Now, the search also was conducted before there was any formal complaint. So this was merely investigatory. There had been no outline of the charges. Essentially, the JTC was going on a fishing expedition to see what they could find. And conveniently, Judge James was out and they did whatever they wanted to search through everything in her office, private or not private, including breaking into a safe. Now, plaintiff is also alleged on the second prong that the search was not reasonably related in scope to the circumstances that defendants contend would authorize or justify the search. Defendants essentially say that the search was justified by a broad allegation of judicial improprieties. But the scope of the search, again, included not only records of the 22nd District Court, Michigan's court, where Judge James was chief judge, but also of her private office and the private locked safe. I just have a question about, I guess, the search at its inception and the scope. So here, as I understand it, Judge James had some responsibility for the financial affairs of the 22nd District. Yes, I think the parties agree on that. Okay, and there are allegations of financial misconduct that have been lodged against her. Isn't it reasonable, based upon what other circuits have said, to conclude that the search was reasonable because there might be these financial documents in her office or her chambers that would be responsive to the concerns, the allegations that have been raised by some of the defendants here? Well, I guess a couple points. I mean, and the first part of it is that at the time of this search, the only allegation was sort of some general, and there was no formal charge brought at all, was generally judicial improprieties. Now, ultimately, that has been fleshed out to mean a number of different things, including financial and some other things that you mentioned, when the formal complaint was filed. But at the time, they were fundamentally looking for any sort of impropriety. So that's point one. I don't have the complaint in front of me at this point, but my recollection was that in her pleading, she pled that she knew that, among other things, she was being looked at for allegations of embezzlement. Is that not? I do think that's generally fair, in the sense that there had been this dispute brewing about financial management of what they were calling the community service fund program. So I agree that generally that's true. Now, ultimately, that came to encompass more improprieties when the JTC brought— We're talking about 12b-6 at this point. Yes, I agree, Your Honor. And the pleadings allege. And she said in her pleading, as I remember it, that among the accusations were embezzlement. I agree, Your Honor. I mean, again, pre-formal complaint, but at the time the search was conducted, there were these general accusations. Right. But the second problem, Your Honor, in terms of reasonableness, and was it reasonable simply because there was some talk, some accusations thrown around about some financial improprieties, even if you say, well, the general office could be searched, let's say things on a desk or an open drawer, she certainly still had an expectation of privacy in the personal safe. And I'm not suggesting that at no time ever could the JTC get access to that. There were lots of ways that perhaps they could get access to that, lots of ways perhaps short of a warrant. I mean, it was a locked safe sitting in an office that at that point was entirely controlled not by Judge James but by a defendant. She couldn't go in there. She wasn't even allowed back in the court. There's no suggestion that she ever tried to do that. So if ultimately, and maybe it would have been opposed, maybe there would have been an argument about it, but ultimately maybe that search could have been approved through more formal procedures and everybody could have found out. But even if it were true that maybe there was some justification to go in there, I'm not sure that that could possibly provide any justification for destroying documents, not categorizing them, indexing them, or doing anything with them. And the suggestion is that they couldn't be exculpatory or she can't identify what was exculpatory and they can't be private and exculpatory rings a little hollow. Because at the time they're searching this safe, there had been no formal complaints. There had, as Judge Batchelder mentioned, been some general accusations about financial improprieties. But ultimately, the JCC filed a formal complaint that encompassed more than just financial improprieties. So- Can you cite us to a case that says that there must be a formal complaint before such a search? I cannot cite you to that, but I would say- Because I would say in the, I think it's the Jackson v. City of Columbus case, which you may have read, that involved search of police chiefs. I think I know- He was on administrative leave, but no formal charges had been brought, I believe. And the search was upheld as reasonable. Right. And I understand that. I know my time's up, but if I may just- You may answer that. Just very quickly, though. But I think what O'Connor does sort of caution about, though, is that in O'Connor, we have to view, at the allegation stage, we have to view it carefully. Because in O'Connor, the district court had in fact granted summary disposition in favor of the employer, went up to the Ninth Circuit Court of Appeals. The Ninth Circuit did the exact opposite, granted summary disposition in favor of the employee. Now, what ultimately happened then in the United States Supreme Court is they said neither one of those is right because there's a lot of facts and circumstances that need to be looked at. And I think we sort of have a similar situation here because we have these allegations, and it was dismissed, again, on a 12b-6. Okay. Thank you, counsel. Thank you. You'll have your full rebuttal. Thank you. Good morning, Your Honors. May it please the Court. My name is Danilo Arteve. I represent the Inkster defendants at police in this matter. That would be the Mayor Hampton of the City of Inkster, the City of Inkster itself, Attorney David Jones, and former Court Administrator Pamela Anderson. As this Court knows, this case has been here before. In fact, Chief Judge Cole, you were on the reviewing panel the last time we were here in 2013. But even before that time, ever since this complaint was initiated back in January of 2012, courts, federal judiciary, has been asking the question, why are we here when there are state disciplinary proceedings going on? And, in fact, these state disciplinary proceedings have concluded. Importantly, the last time this Court was here, on page 9 of its opinion, this Court said, accordingly, we find James could have raised her federal constitutional claims in the state proceedings, either at her JTC hearing or during judicial review of the JTC decision. Yet, despite this acknowledgment, here we are again to address two constitutional issues, the Fourth Amendment and the Equal Protection Claim. And I will focus my argument on the Fourth Amendment claim. Ms. Miller, who represents the state defendants, will address the Equal Protection claim. Your Honors, the Fourth Amendment claim, as it appears in Judge James's initial complaint, was premised on the erroneous belief that a warrant or probable cause was required for a workplace search to investigate workplace misconduct. Now it appears in the briefing, the appellate briefing, that the parties agree that, in fact, it's the O'Connor v. Ortega test that controls. In that case, the United States Supreme Court instructed that the search simply must be reasonable under all the circumstances. And there are two prongs to this. As counsel acknowledged, there is the reasonableness at the inception and reasonableness in scope. And yet, there are factors that appear on the face of the complaint here that render the search reasonable. First of all, the search was instigated following an audit by Deborah Green and this financial audit revealed that there were certain financial improprieties, misuse of court funds in the CSP program, facts that were ultimately confirmed by the Michigan Supreme Court. And Judge James was fully aware of this. And again, Judge Batchelder, you pointed out that on the face of, correctly pointed out that on the face of the complaint, Judge James was well aware of this audit and these allegations of financial improprieties before this alleged search even took place. Also, there's no dispute that this alleged search took place only after a judicial body conducted a review and determined that it was appropriate to place Judge James on administrative leave. The Michigan Supreme Court made this determination. There's no dispute that this was the case. She was suspended. Does that appear on the face of the complaint? Yes, Your Honor. It was pled that in, I believe it is paragraph 25 of the complaint, where she alleges that Chief Judge Young suspended her after a unanimous vote by the Michigan Supreme Court pre-search. With respect to the scope of the search, there's no dispute that this search targeted her office, her judicial office paid for public taxpayer, with taxpayer funds. And this is not a case where the JTC or its agents or the state court administrator's office went and searched her car for evidence. This is not where they went and searched her house. This was simply limited to her office, which, as Judge James acknowledged again, is the instrumentality of the charges against her. The allegations which she was aware of all stem from the fact that she abused her position as judge. She misused public funds. She engaged in administrative improprieties and employment improprieties. So the office which was allegedly searched was an instrumentality, and that was all that was searched, making the search reasonable on its face. As I understand the record, based upon the pleadings, the safe was her personal property, not the property of the court, and she had a personal lock or two, maybe two locks, on the safe. So would you address why it's reasonable to search the safe if, in fact, it was searched? Well, certainly, Your Honor. First of all, again, there's no dispute that the safe was located in her office, and I don't think there's any precedent for the fact that you can simply bring in a safe into your public office paid for by taxpayer funds to your job and somehow expect that everything in that safe is sacrosanct and cannot be searched in the scope of a workplace investigation. I believe the Supreme Court in Ortega v. O'Connor recognized the easy way to avoid exposing so-called private documents to workplace searches is to leave them at home. And second of all, Your Honor, Judge James keeps referring to these exculpatory documents that may have existed, may have been in this safe. But by the nature of the complaint, by the nature of this matter, exculpatory documents necessarily implies that these were public documents because there were public charges of these were, I'm sorry, the charges against Judge James were charges of misuse of public office, misuse of public funds, misuse of her position as a public official. So I guess the preliminary issue is whether even there were private documents involved here, and Judge James, to this point, three years down the road, cannot tell us what exactly she thinks was exculpatory, what was in the safe, what was it that she couldn't obtain through discovery in the JTC proceeding and then supplement the record through amendment or other process. It's simply not there that there was anything that would render the search unreasonable. And I guess to balance that, we have these factors that appear on the face of the complaint that render the search reasonable in its inception and in scope, as I have just stated. But on the other hand, there is nothing in the complaint that would render the search unreasonable, even giving the plaintiff the full benefit of the doubt. And I suppose, Your Honor, if I could just briefly address the issue of supplemental jurisdiction as well here. And Judge James argues on appeal that the district court abused its discretion when it declined to exercise supplemental jurisdiction over these so-called state law claims that were asserted. Now, setting aside the fact that this supplemental jurisdiction question was not properly appealed in the first instance, the district court concluded back in 2012 that it would not exercise supplemental jurisdiction because these issues presented novel and complex state law claims. Now, this particular factor was never argued on appeal. Instead, in the appellant's briefing, it appears that they take issue with the conclusion because of interests of judicial economy, a completely separate and distinct interest. So there's absolutely no basis for this court to reconsider or reverse the district court's exercise of its discretion on the supplemental jurisdiction question. And if this court has no questions for me, I'd like to defer to Ms. Miller to address the equal protection. Thank you. Thank you. Good morning, Your Honors. Jean Marie Miller on behalf of Defendant Appellants, the Judicial Tenure Commission, Paul Fisher, Deborah Green, and Judge Valdemar Washington. In support of her claim in the complaint where she alleges an equal protection claim, Judge James certainly presented no evidence, if you look at the complaint on its face, that showed any sort of discriminatory animus or intentional discrimination by any of the defendants. The most she pleads in paragraphs 56 through 59 of her complaint, and that's at page ID 14 and 15, is she cites four examples of other judges who all had been sued by employees of their court and obtained substantial judgments against those judges. And she asserts that, well, they didn't investigate those individuals. Those individuals were found in a civil court to have violated the law, and so our conduct is similar. Those judges were Caucasian, therefore my equal protection rights were violated. If you take a look at the complaint, however, the complaint isn't very clear as to how she's using those judges. She lists these examples of these four judges and then goes into the next allegation is about entrapment by estoppel, and she never actually specifically pleads equal protection. But assuming she does plead equal protection, the issue here is can she compare herself to these judges? Has she alleged facts that she engaged in conduct substantially similar to these other four individuals? And it's clear from the face of the complaint that she did not. Let me just interrupt one second. So my reading of the district court's opinion is that the district court essentially required James to plead a prima facie case under McDonnell Douglas. Yes, correct. Do you agree with that or not? I would. But it was saying that under Iqbal and Twombly, she simply has to allege facts that are sufficient to state a claim for relief that is plausible on his face. I would agree with that. Okay. So the district court may have, at least arguably, misstated the standards. So I'd be interested in hearing your view on why, in terms of the allegations of her complaint, she has not stated a claim that is plausible on his face. She may lose later on at summary judgment, but I'm just wondering what your response is to that. Well, to state a claim that's plausible, you have to show facts that would present the elements of that claim. Here, she is saying, I was treated differently than individuals that were similarly situated to me. That's the only reading that can be made of her complaint because there was no allegations about intentional discrimination. And here, if you just look at the allegations on their face, there is no way that anyone could determine or that those facts allege that she was being treated in a dissimilar manner. None of those judges engaged in the same type of impropriety that she was alleged to have engaged in and that she was being investigated for. She admitted in the complaint that she was being investigated for misuse of funds, possible embezzlement. The most she alleges with these four judges is they had judgments against them and they should have been investigated. When looking at equal protection, they apply the same standard that you apply for Title VII claims. In Title VII, the court has been very clear in this circuit, in the Mitchell case, that the individuals must have, you have to allege and you must show, that the individuals engaged in the same conduct, violated the same rules, and were treated differently. These facts, as alleged, it's not plausible that she can prove that because she has not alleged that those judges violated the same rules she did and was treated differently. So under the Iqbal standard, it isn't plausible. I think this is entirely consistent with Iqbal, and I think under Iqbal, you have to look at the elements of a prima facie case to know if it's plausible that she's pled a claim. I think those two things are interrelated. Here, as I said, the most she alleges is that these other judges have engaged in this other conduct. She hasn't shown that these other judges are even alleged in the complaint, that they misappropriated funds, that they denied citizens access to the court, that they employed a family member in violation of the court policies, or made misrepresentations during JTC proceedings. And that is, in fact, why she was removed and investigated. She pled no facts that any non-African-American judge engaged in the similar conduct. And the fact, just as a demonstration as to how similar you need to show things, a panel of this court just this year, in the case of Summerfield v. Gorniak, was presented with the situation where you had coroner employees who had released bodies improperly. To funeral homes. And an employee brought a Title VII claim, but it's the same analysis, and said, I was treated differently because another employee improperly released a body, and he wasn't terminated, and I was. And the court there said, no, no, no. You may have both been charged with releasing a body improperly, but one employee misread the form. You, plaintiff, failed to read the form. That distinction was enough for this court to hold that somebody was not similarly situated. So it's not just sufficient to say, as the plaintiff has alleged in their reply, that, well, they're all claiming we did something that may have violated the law. You have to look at specifically what is alleged. And if you look at the complaint, she hasn't alleged anything, with regard to any other judge, remotely similar to what she was charged with. Thank you, Ms. Miller. Good morning again, Your Honors. First, I just wanted to very quickly address at least one point on the Fourth Amendment claim. And I think Brother Counsel was up here sort of suggesting that, well, one easy way for an employee not to have to worry about any of her private material being searched is, well, you don't bring it to the office. But, in fact, in O'Connor, the Supreme Court was concerned about that very issue and was concerned that we not be too hasty in making that determination. The Supreme Court said in O'Connor, not everything that passes through the confines of the business address can be considered part of the workplace context, however. An employee may bring closed luggage to the office prior to leaving on a trip, or a handbag, or a briefcase each workday. So this is the very sort of factual determination. And, you know, in this context, it's someone who had worked in the very same office for 23 years. Been there a very long time. You don't necessarily bring everything back and forth every day. You start to consider that office a place for some of your private things. And in this particular case, there were also some precautions taken. It was a locked safe. It wasn't just her papers strewn around. One other very quick point on the idea that exculpatory documents could not be private in this context because it's a matter of public funding. I mean, certainly there are some situations where a private document could be used to rebut the charges. I mean, for example, some of the charges were that certain campaign items for a campaign were taken from funds that should not have been for her private campaign. Well, a private document would be receipts or other evidence showing how that was paid for. So, and I'm not suggesting that's here, but just as a hypothetical. So, but the broad proposition that when you have a public complaint, private documents could not possibly be in play, I don't think truly holds water. I did also then want to address the equal protection argument. And although I don't think that the complaint is a picture of artful pleading, I know I'm here to take the slings and arrows for that, but count four of the complaint does specifically say that it's a count for equal protection. But with respect to the similarities that have to be alleged. Now, in the complaint, the level of similarity, Judge James identifies five judges, Caucasian, four men, one woman, who were alleged with a variety of improprieties. Now, the degree of similarity, it seems to me, it's a little premature on the pleadings to determine that degree of similarity, number one. And number two is the standard has to be viewed in a certain context. And the context is the JTC, when it investigates a judge, it does that privately. It does not make those names public. It doesn't make it public unless there's formal charges. So for a judge like Judge James, who is formally charged and is alleging that she was formally charged disparately because she happens to be an African-American judge and other judges were not, it's difficult to obtain examples of other judges. Now, the ones in here happen to have been made public for various reasons. Some had civil cases. Some the media was on. But some of the other factors to look at when you talk about similarity is do they have the same superiors? Do they have to follow the same rules? Here, all the judges of the state of Michigan are essentially supervised ultimately by the Michigan Supreme Court. It does that in part through the Supreme Court Administrator's Office, in part through the Judicial Tenure Commission. So all these judges were generally subject to the same thing. I mean, I think if the suggestion is there's a lot of judicial canons in Michigan, as I'm sure everywhere else. There's a lot of rules of professional conduct. So I think the suggestion that a judge who is claiming disparate treatment would have to find some other judge who allegedly violated, let's say, the same particular canon of judicial ethics in order to even begin to demonstrate a claim for disparate treatment is simply not the appropriate pleading standard. And I certainly agree that Iqbal Twombly applied, but she has alleged certain facts that could pink out her claim. She named some judges. She managed to find some. And so then the question becomes, which I don't think is a pleading question, which is why we think the summary dismissal was premature, is what were all those circumstances? You know, why didn't the JTC pursue charges? We don't know those answers. We certainly didn't know that at the time of pleading. But we alleged that one reason is, well, those five judges were Caucasian and that the JTC treats African-American or minority judges differently. And I think that the summary disposition was improper then because I think it was sufficiently plaid. I see my time is up unless the Court has anything else. Apparently not. Thank you, counsel, all three of you for your arguments today. We really do appreciate them. And the case will be submitted. I know we have one case.